**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FRANK AVILA, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| WELLS FARGO BANK, N.A., BANK OF | ) |
| AMERICA N.A. SUCCESSOR IN INTEREST | )        JURY DEMANDED |
| TO WILSHIRE CREDIT CORPORATION; | ) |
| SETERUS, INC., F/K/A IBM LENDER | ) |
| BUSINESS PROCESS SERVICES, INC., | ) |
| VANTIUM CAPITAL INC., DBA ACQURA | ) |
| LOAN SERVICES, HOME SERVICING LLC | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

## INTRODUCTION

1.     Plaintiff, previously a Captain and Judicial Advocate General of the United States Military, was on active duty in service of his country from June, 2010, to January, 2012.  Despite receiving multiple notices of plaintiff's active military status, defendants refused to comply with the requirements of the Servicemembers Civil Relief Act ("SCRA"), and filed and prosecuted a foreclosure action against plaintiff's home.  Defendants' conduct has damaged plaintiff's credit, caused him great emotional distress, and caused him to incur additional interest and fees.

2.     In addition to completely disregarding their statutory duties under the SRCA, in the face of plaintiff's repeated requests for a mortgage loan modification defendants also ignored their obligations under the Home Affordable Modification Program ("HAMP") and pursued foreclosure despite never fully evaluating plaintiff for a loan modification or other loss mitigation options.

1

3.     Plaintiff brings this action against his mortgage servicers and the alleged holder of his note and mortgage for violations of the SCRA, the Illinois Consumer Fraud Act and the Real Estate Settlement Procedures Act ("RESPA").

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U. S. C. § 1331, 50 U. S. C. app. §§ 501-596 ("SCRA") and 12 U. S. C. § 2506 ("RESPA"). This Court has supplemental jurisdiction over plaintiff's state law claim pursuant to 28 U. S. C. § 1367.

5.     The property at issue is located in the Northern District of Illinois and the relevant transactions took place in the Northern District of Illinois. Thus, venue is proper in the District.

## PARTIES

6.     Plaintiff, a hardworking and patriotic individual, owns his home located at 475 Raintree, Unit 2B, Glen Ellyn, IL 60137.  From 2003 until 2013, Mr. Avila was a member of the Army Reserves and was called to active duty from 2010 until 2012. In addition, Mr. Avila is an active member of his community and an attorney primarily representing individuals in criminal, employment, and civil rights cases.

7.     Defendant Wells Fargo Bank, N. A. ("Wells"), is a national banking association chartered in Sioux Falls, South Dakota, and does business in Illinois.  Its principal place of business is at 420 Montgomery Street, San Francisco, CA, 94104-1207.  Wells was one of the largest subprime mortgage lenders in the United States prior to the collapse of the subprime market in 2008 and remains one of the largest mortgage lenders in the United States today. Wells is the purported Certificate Trustee in Trust for Registered Holders of VNT Series 2010-1, the trust in which plaintiff's note is believed to be held.

2

8.      Defendant Bank of America, N.A., ("BANA") successor in interest to Wilshire Credit Corporation, ("Wilshire"), is a national banking association with its principal place of business located at 100 N. Tryon St., Mailcode Nc 1-007-18-01, Charlotte, NC 28255-0001.  At all times relevant to the facts alleged herein, Wilshire was engaged in the business of servicing residential mortgage loans.  At certain times relevant to plaintiff's complaint, Wilshire had the servicing rights to plaintiff's mortgage loan, which serviced plaintiff's loan during the relevant time.

9.      Defendant Seterus, Inc., f/k/a IBM Lender Business Process Services, Inc. ("IBM"), is a Delaware corporation with its principal place of business located at 14523 SW Millikan Way #200, Beaverton, OR 97005.  Its registered agent in Illinois is CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, Illinois.  IBM is engaged in the business of servicing residential mortgage loans.  On information and belief, IBM purchased a portion of the interest in Wilshire and may be a successor in interest to Wilshire.

10.     Defendant Vantium Capital Inc., dba Acqura Loan Services ("Acqura") is a limited liability corporation with its principal place of business located at 7668 Warren Pkwy #325, Frisco, TX 75034.  Its registered agent in Illinois is CT Corporation System, 208 S. LaSalle Street, Suite 814, Chicago, Illinois. Acqura was engaged in the business of servicing residential mortgage loans. At certain times relevant to plaintiff's complaint, Acqura had the servicing rights to plaintiff's mortgage loan.

11.     Defendant Home Servicing LLC ("Home Servicing") is a limited liability corporation with its principal place of business located at 533 Highlandia Dr., Ste. B, Baton Rouge, LA 70810.  Its registered agent in Illinois is CT Corporation System, 208 S. LaSalle

Street, Suite 814, Chicago, Illinois. Home Servicing is the current servicer of plaintiff's

mortgage loan.

## FACTS RELATING TO ALL CLAIMS

12.     Plaintiff was a member of the United States Army Reserves from

approximately August, 2003 to August, 2013. He served in active duty from June, 2010, to

January, 2012. When he was honorably discharged and ended his service in 2013, he held the

rank of Captain and had served as a Judicial Advocate General.

13.     In July 2005, plaintiff purchased the property at 475 Raintree, Unit 2B,

Glen Ellyn, IL 60137, as his home. To assist with the purchase of the property, Mr. Avila

obtained a mortgage loan from Argent Mortgage Company, LLC. The following are true and

accurate reproductions of relevant documents:

            a.      a note evidencing plaintiff's mortgage loan (attached as Exhibit

A);

            b.      a mortgage pertaining to plaintiff's mortgage loan (attached as

Exhibit B);

14.     At the time Mr. Avila obtained the mortgage loan in 2005, he was not on

active duty with the military.

15.     At some point in time after the closing of the July 2005 transaction,

servicing and ownership of plaintiff's loans was apparently transferred to Wells.

16.     Subsequently, plaintiff's mortgage loan was serviced by Wilshire and later

by Acqura. Plaintiff did not receive notice of the transfer of servicing from Wilshire to Acqura

(and, thus, without discovery is unaware of when the transfer occurred).

17.    On information and belief, at some point during or after 2012, the servicing rights of plaintiff's mortgage were transferred to Home Servicing, the current servicer. Plaintiff did not receive notice of the transfer of servicing from Acqura to Homeservicing (and, thus, without discovery is unaware of when the transfer occurred).

18.    As servicers, defendants Wilshire, Acqura, and Home Servicing act and acted on their own behalf and as agent for the owner and holder of the plaintiff's note and mortgage, Wells.

### Relevant Protections Provided by the SCRA

19.    The SCRA, 50 U.S.C. appx. §§ 501-596, was enacted in order "to provide for the temporary suspension of judicial and administrative proceedings and transactions that may adversely affect the civil rights of servicemembers during their military service." 50 U.S.C. appx. § 502 (b).

20.    Servicemember "means a member of the uniformed services," and "military service" includes a member of the Army who is on active duty. 50 U.S.C. appx. § 511(1)(2). Active duty "means full-time duty in the active military service of the United States. Such term includes full-time training duty, annual training duty, and attendance, while in the active military service . . . ." 10 U.S.C. § 101(d)(1) (*incorporated by* 50 U.S.C. appx. § 511(2)(A)(i)).

21.    The SCRA states in relevant part:

**An obligation or liability bearing interest at a rate in excess of 6 percent per year that is incurred by a servicemember, or the servicemember and the servicemember's spouse jointly, before the servicemember enters military service shall not bear interest at a rate in excess of 6 percent--**
    **(A) during the period of military service and one year thereafter, in the case of an obligation or liability consisting of a mortgage, trust deed, or other security in the nature of a mortgage.**

5

50 U.S.C. appx. § 527(a)(1). Further, "[t]he term 'interest' includes service charges, renewal charges, fees, or any other charges (except bona fide insurance) with respect to an obligation or liability." *Id.* (d)(1).

### *The Purpose of HAMP*

22. On October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008 and, on February 17, 2009, amended it with the American Recovery and Reinvestment Act (collectively, "the Act"). 12 U.S.C. § 5201 et seq. (2009). The Act has been subsequently amended.

23. The Act's purpose is to grant the Secretary of the U.S. Department of the Treasury ("the Secretary" or "Treasury") the authority to restore liquidity and stability to the financial system, and to ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C. § 5201.

24. The Act grants the Secretary the authority to establish the Troubled Asset Relief Program ("TARP"). 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.

25. Congress allocated up to $450 billion to Treasury for TARP. 12 U.S.C. § 5225.

26. The Act mandates that the Secretary, in exercising his authority to administer TARP, "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

27. The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and shall use the Secretary's authority over

loan servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219.

28.     The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

29.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C. § 5220.

30.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable Program.

31.     The Program is intended to assist approximately 7 to 9 million families restructure or refinance their mortgages to avoid foreclosure.

32.     The Making Home Affordable Program consists of two major subprograms. The first of these relates to the creation of refinancing products for homeowners with minimal or negative equity in their home, known as Home Affordable Refinance Program or "HARP."

33.     The second major subprogram – the one at issue in this case - relates to the creation and implementation of a uniform loan modification protocol, known as "HAMP."

34.     HAMP is funded by the federal government, primarily with funds from TARP. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP or "bailout" money.

35.     Under HAMP, the federal government incentivizes participating loan servicers to enter into agreements with struggling homeowners to make adjustments to existing

7

mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000 for each completed HAMP modification.

36.     The mortgage industry entities that perform the actual interface with borrowers – including such tasks as payment acceptance and processing, collections, credit reporting, escrow account maintenance, loss mitigation and foreclosure – are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans.

### *Plaintiff's Servicers were Obligated to Comply with HAMP*

37.     If a servicer elects to participate in HAMP, it signs up by executing a Servicer Participation Agreement ("SPA") with the federal government.

38.      On or about April 17, 2009, Wilshire, through its president and chief executive officer, executed an SPA with Fannie Mae, as agent for the U.S. Department of the Treasury. A copy of the SPA is attached as Exhibit C.

39.     On or about April 17, 2009, BANA, through a senior vice president, executed an SPA with Fannie Mae, as agent for the U.S. Department of the Treasury. A copy of the SPA is attached as Exhibit D.

40.     On or about August 4, 2010, through an executive vice president, Acqura executed an SPA with Fannie Mae, as agent for the U.S. Department of the Treasury. A copy of the SPA is attached as Exhibit E.

41.     The SPAs specifically incorporate all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by Treasury, Fannie Mae and Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation." (Ex. C, Sect. 1.A; Ex. D, Sect. 1.A; Ex. E, Sect. 1.B).

42.     Wilshire, Acqura, and BANA agreed to be bound by all of the terms and conditions of the SPA contract relative to mortgage loans, particularly with respect to HAMP loan modifications and foreclosure prevention services.

43.     A primary purpose of each SPA is to assist homeowners who are delinquent or facing foreclosure.

44.     The SPAs mandate that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."  (Ex. C, Sect. 1.A; Ex. D, Sect. 1.A; Ex. E, Sect. 1.B).[1]

45.     For instance, the Program Documentation required and requires participating servicers to "consider all eligible mortgage loans" which are 60 days or more delinquent for a HAMP modification, and to suspend foreclosure proceedings or not to proceed to sale (if a foreclosure is already pending) while the borrower is being evaluated for HAMP. (Supplemental Directive ("SD") 09-01, pp. 1, 4 and 14 (Apr. 6, 2009); HAMP Handbook, v.1.0, (Aug. 1, 2010)).

46.     Moreover, the HAMP guidelines require participating servicers to, among other things:

a.      Use reasonable efforts to contact borrowers and to identify and solicit borrowers who are potentially eligible for HAMP;

b.      Communicate with borrowers in a manner that helps the borrower understand the HAMP modification process;

c.      Maintain "adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers are not required to submit multiple copies of documents;"

---

[1] The Program Documentation also includes all Supplemental Directives for HAMP, the HAMP Handbook as periodically amended; Base Net Present Value ("NPV") Model Specifications and Supplemental Documentation such as Frequently Asked Questions.  These documents together describe the basic activities required under HAMP.

    d.      Refrain from referring a loan to foreclosure until after a borrower has been evaluated for HAMP and determined to be ineligible;

    e.      Collect financial information from homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;

    f.      Perform the "loss mitigation waterfall" and provide a temporary trial modification for borrowers who are eligible for a modification;

    g.      Grant a permanent loan modification to borrowers who complete the three-month trial modification; and

    h.      Provide the requisite written notices to borrowers to inform borrowers whether or not they are eligible for HAMP and, if ineligible, to provide reasons for the denial.

47.      Borrowers who are in military service and are temporarily displaced from their home are eligible for HAMP.

*Defendants' Servicing Practices Violated SCRA and HAMP*

48.      In 2007, 2009, and 2010, Mr. Avila suffered from various medical ailments, including a brain tumor a/k/a pituitary adenoma (macro-adenoma) which was surgically removed, viral myocarditis, and a tumor (schwanoma) in his leg.

49.      As a result of plaintiff's medical ailments, he was unable to work as much as he had in the past and, thus, suffered from financial difficulty and had trouble making his mortgage loan payments. Plaintiff repeatedly requested Wells, Wilshire, and Acqura grant him a deferment in payments for reason of medical necessity. Although defendants told plaintiff that they had such medical deferment programs in place, they refused to grant him a medical deferment.

50.      Sometime in late spring or early summer 2009, plaintiff spoke with Zandra Okal, an employee of Wilshire over the telephone. Plaintiff told Okal that he was interested in a loan modification under the HAMP guidelines.

51.     Okal told plaintiff that, if he submitted a $9,600 check to Wilshire, Wilshire would reinstate his loan and offer him a modification.

52.     Subsequently, on or about September 16, 2009, plaintiff sent Wilshire a check for $9,600 to reinstate the loan and obtain the loan modification as represented by Okal. However, Wilshire returned the check to plaintiff and refused to reinstate the loan or provide a loan modification.

53.     Thereafter Wilshire demand that plaintiff make a payment of approximately $35,000 in order to reinstate the mortgage and receive a loan modification. Plaintiff submitted a check for approximately $35,000 to Wilshire by wire transfer. Wilshire then reinstated plaintiff's loan but still refused to properly consider plaintiff for a loan modification under HAMP, its "in-house" modification programs, and other loss mitigation options.

54.     Prior to March 2010, plaintiff learned that he would likely be receiving military Orders to be deployed to participate in a mission to aid wounded soldiers.

55.     In late March or early April 2010, plaintiff submitted letter outlining his hardship, requesting a modification, and informing Wilshire that he had been activated the United States Army.

56.     In May 2010, plaintiff received Orders from the United States Army ordering him to active duty ("the 2010 Orders"). Plaintiff's 2010 Orders, as subsequently amended, required him to be on active duty from June 1, 2010, until May 30, 2011.

57.     Plaintiff reported for active duty and was mobilized to Fort McCoy, WI, and then assigned and deployed to Tripler Army Medical Center, HI.

58.     On or about May 26, 2010, plaintiff submitted his 2010 Orders to his then-servicer Wilshire. Along with the 2010 Orders, plaintiff submitted a letter to Wilshire informing

11

it of his deployment, requesting that Wilshire reduce his interest rate, and requesting a loan modification. At all relevant times, plaintiff met the threshold eligibility requirements for the HAMP program and was qualified for a permanent modification.

59.     On or about June 2, 2010, plaintiff again sent his 2010 Orders to Wilshire with a letter informing it of his 2010 Orders and requesting that Wilshire reduce his interest rate pursuant to the SCRA and modify his loan.

60.     Both in May and in June, 2010, Wilshire refused to adjust plaintiff's interest rate to six percent or less, as required by the SCRA.

61.     On October 21, 2010, while plaintiff was on active duty in the U.S. Army, Wells filed a complaint for foreclosure in the Circuit Court for the 18th Judicial District in DuPage County, IL (Case no. 2010 CH 6090).

62.     On or about November 15, 2010, after learning that Wells filed a foreclosure complaint, Mr. Avila sent Wells, along with a copy of his 2010 Orders, a letter explaining that he was on active duty, requesting a loan modification, and requesting compliance with the SCRA.

63.     Following plaintiff's November 15, 2010, letter and while plaintiff was still on active duty, Wells and its then-servicer Acqura refused to reduce plaintiff's interest rate as required by the SCRA and refused to consider modifying his loan. Plaintiff called Acqura repeatedly and requested a reduction in his interest rate and a loan modification, to no avail.

64.     In the time following the filing of the foreclosure lawsuit, plaintiff sent letters, faxes, and emails to Wells and Aqcura's attorneys asking for compliance with the provisions of the SCRA. Wells and Aqcura still refused to reduce plaintiff's interest rate under the terms of the SCRA.

65.     In 2011, plaintiff's Orders were extended. On July 15, 2011, plaintiff received Orders stating that he was retained on active duty with the U.S. Army and that he would remain on active duty until January 11, 2012 ("the 2011 Orders").  Plaintiff remained on active duty until January 1, 2012.

66.     Plaintiff was on continuous Title 10 active duty on official mobilization with no interruptions from June 1, 2010, until January 1, 2012.

67.     Throughout plaintiff's active duty, he continued to repeatedly request that Wells, Wilshire, and Acqura reduce his interest rate and grant him a loan modification.  Plaintiff received the assistance of Jim DiChristifano, who also submitted plaintiff's military Orders on plaintiff's behalf.

68.     In addition, plaintiff and Mr. DiChristifano submitted plaintiff's Orders to Wells' various attorneys who represented it in its efforts to foreclose on plaintiff's mortgage loan, including Codilis & Associates, PC, and Potestivo & Associates, P.C.

69.     In 2012, plaintiff telephoned Acqura to apply for a loan modification under the HAMP modification program. Acqura's representative told plaintiff that it was not a participant in HAMP and refused to allow plaintiff to apply.  Acqura's representative's statement was false. As Acqura's signed SPA shows.

70.     Moreover, throughout the servicing of the loan by defendants, plaintiff has made multiple requests for short sale, all of which have been ignored by defendants.

71.     In addition to paragraph 69 above, defendants violated HAMP in the following ways.  First, on information and belief, defendants Wilshire and Acqura did not have adequate staffing capacity and did not adequately train its employees regarding the implementation of HAMP.

72.     Second, defendants Wilshire and Acqura did not use reasonable efforts to determine if plaintiff qualified for a HAMP loan modification. Third, defendants Wilshire and Acqura did not collect financial information from plaintiff to determine if he qualified for HAMP. In fact, Wilshire and Acqura did the opposite; they prevented plaintiff from applying for a modification under HAMP by refusing his initial inquiries and providing misinformation.

73.     Fourth, plaintiff did not ever receive (because they were not sent) written notices from defendants Wilshire and Acqura stating whether he was eligible for a HAMP loan modification or other loss mitigation options.

### *Defendants' Conduct Caused Plaintiff Harm*

74.     As a result of defendants' conduct, plaintiff has been damaged. Despite the fact that plaintiff gave defendants notice that he was on active duty, defendants refused to reduce plaintiff's interest and plaintiff's loan accrued interest at a rate higher than 6.0%.

75.     Moreover, due to defendants' refusal to comply with HAMP and SCRA, plaintiff has suffered and continues to suffer the distress of the imminent risk of losing his home to foreclosure, severe and ongoing damage to his credit, and is responsible for more accrued interest, fees, and litigation costs because of the foreclosure lawsuit than he would have had defendants reduced his interest rate and modified his loan.

### *Tolling*

76.     Pursuant to the SCRA, the time Mr. Avila spent in active duty may not be counted toward the calculation of the time he had in which to bring any action in a court. 50 U.S.C. appx. § 526(a).

77.     Mr. Avila's period of active duty (June, 2010 - through January, 2012) may not be counted at all when determining the period in which he was required to file the causes of actions alleged herein.

### COUNT I – SCRA

78.     Plaintiffs incorporate paragraphs 1-77 as if fully set forth herein. This count is against all defendants.

79.     Plaintiff was in active military service from June 2010 until January 2012.

80.     Plaintiff incurred his mortgage loan prior to entering military service.

81.     The rate of interest on plaintiff's mortgage loan is adjustable. The rate started at 6.25% but adjusted beginning in August, 2008.  The interest rate may adjust every six months to 4.0% higher than the current LIBOR, as defined by the Note.  The interest rate can only and has only adjusted upwards, never downwards.

82.     Plaintiff repeatedly notified defendants that he would be and was on active duty.

83.     Defendants violated the SCRA, 50 U.S.C. appx. § 527, by failing to adjust plaintiff's interest rate on his mortgage loan to a rate not in excess of 6 percent, by charging fees and other charges that meet the definition of interest under the SCRA, by foreclosing on an arrearage calculated on the basis of an interest rate not authorized by the FCRA, and by failing to forgive interest accrued in excess of 6 percent.

84.     As a result of defendants' conduct, plaintiff has suffered the harms outlined above.

85.     SCRA § 597a provides in relevant part:

**(a) In general. Any person aggrieved by a violation of this Act may in a civil action--**

      **(1) obtain any appropriate equitable or declaratory relief with respect to the violation; and**

      **(2) recover all other appropriate relief, including monetary damages.**

      **(b) Costs and attorney fees. The court may award to a person aggrieved by a violation of this Act who prevails in an action brought under subsection (a) the costs of the action, including a reasonable attorney fee.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:

    a.    Compensatory, actual, punitive and other appropriate damages;

    b.    Equitable relief in the form of a retroactive reduction in the interest rate and the cancellation of interest, fees and charges accrued at the unlawful rate;

    c.    Attorney's fees, litigation costs; and

    d.    Such other or further relief as the Court deems just.

## COUNT II – ILLINOIS CONSUMER FRAUD ACT

86.    Plaintiff incorporates paragraphs 1-85 and 95 – 98 as if fully set forth herein. This count is against all defendants.

87.    Defendants engaged in unfair and deceptive practices, in violation of Section 2 of the Illinois Consumer Fraud Act, 815 505/2, by intentionally and/or negligently acting in a manner unfair to plaintiff.

88.    Defendants' deceptive and/or unfair acts or practices include but are not limited to (a) (all defendants) failing to adjust plaintiff's interest rate on his mortgage loan during his active duty and for one year following his active duty, as mandated by the SCRA; (b) (Wells) filing foreclosure with knowledge that plaintiff was on active duty in the U.S. Army, in violation of the SCRA; (c) (all defendants) referring plaintiff's loan to foreclosure even though he had not

been properly reviewed for a HAMP loan modification; (d) (all defendants) misrepresenting to plaintiff that defendants were not participants in HAMP; (e) (Wilshire) misrepresenting to plaintiff that it would reinstate the loan and grant a modification if plaintiff submitted $9,600 and later refusing to reinstate and modify plaintiff's loan; (d) (Wilshire) misrepresenting to plaintiff that it would modify his loan after he submitted a payment of approximately $35,000 and refusing to grant a modification; (e) (all defendants) refusing to grant plaintiff a temporary abatement in payments for serious illness even though defendants had such a program in place; (f) (all defendants) refusing to apply and follow the HAMP guidelines with regard to plaintiff; (g) (all defendants) failing to give plaintiff notice of the transfer of the servicing rights of plaintiff's mortgage loan, in violation of RESPA; and (h) other unfair and deceptive acts described above and below.

89.     Defendants' actions were unfair, in violation of the Illinois Consumer Fraud Act, in that they offend public policy; are immoral, unethical, oppressive or unscrupulous; and/or caused substantial injury to consumers, including plaintiff.

90.     Defendants, who are presumed to intend the necessary consequences of their actions, engaged in such conduct with the intent that plaintiff rely on their deceptive and/or unfair acts.

91.     Defendants engaged in such conduct in the course of trade and commerce.

92.     Defendants' actions were willful and wanton, constitute gross negligence, and were done with a reckless indifference towards plaintiff's rights in that defendants deliberately referred plaintiff's loan to foreclosure and wrongfully filed a foreclosure action on plaintiff's home, in violation of the SCRA and HAMP program rules.

93. Plaintiff has been damaged. As a result of defendants' conduct, plaintiff has incurred greater interest and fees on the loan and has suffered and continues to suffer further decline in his credit ratings due to defendants' adverse credit reporting and the filing of the foreclosure action. Defendants' unnecessary foreclosure filing against plaintiff has caused him and continues to cause him great emotional distress.

94. Defendants' conduct directly and proximately caused plaintiff's injuries.

WHEREFORE, plaintiffs respectfully request the following relief:

    a.    Actual damages;

    b.    Attorney's fees, litigation expenses and costs;

    c.    Punitive damages; and

    d.    Such other or further relief as the Court deems just.

## COUNT III – RESPA

95. Plaintiff incorporates paragraphs 1-77 as if fully set forth herein. This count is against all defendants.

96. In violation of their duties under RESPA, 12 U.S.C. §2605(b) and (c), Wilshire, Acqura and Home Servicing failed to give plaintiff notice of the transfers of servicing from Wilshire to Acqura or from Acqura to Home Servicing.

97. On information and belief, Wilshire, Acqura, and Home Servicing have a pattern and practice of noncompliance with the requirements of 12 U.S.C. § 2605.

98. Plaintiff has been injured as a result of defendant's conduct. Due to defendants' concealment of the servicers in this case, at various times plaintiff has been unable to communicate with the operative servicer in order to request reinstatement of his loan, obtain information regarding his account, including information about how to make application for loss

mitigation options, or address to the right party his concerns relating to the servicers' adverse credit reporting to the credit bureaus.

    WHEREFORE, plaintiff requests that the Court enter judgment in favor of the plaintiff and against defendants for:

    a.  Compensatory damages;

    b.  Statutory damages;

    c.  Attorney's fees, litigation expenses and costs of suit; and

    d.  Such other or further relief as the Court deems proper.

        Respectfully submitted,

        /s/Al Hofeld, Jr.
        Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
And the Social Justice Project, Inc.,
1525 East 53rd Street, Suite 832
Chicago, Illinois  60615
(773) 241-5844
(773) 241-5845 (FAX)

**JURY DEMAND**

Plaintiff demands trial by jury.

/s/Al Hofeld, Jr.
Al Hofeld, Jr.


**NOTICE OF LIEN**

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

/s/Al Hofeld, Jr.
Al Hofeld, Jr.

20

**NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS**

      I, Al Hofeld, Jr., attorney for plaintiff, hereby certify that on October 30, 2014, filing and service of the foregoing *Complaint,* was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

/s/Al Hofeld, Jr.
Al Hofeld, Jr.
